# EXHIBIT B

# CONSULTING AGREEMENT

<u>**CONSULTING AGREEMENT**</u>

This Consulting Agreement, dated as of March 20, 2009 (this "<u>Agreement</u>") is made by and between Gordon Brothers Retail Partners, LLC, a Delaware limited liability company with a principal place of business at 101 Huntington Avenue, 10th Floor, Boston, MA 02199 (the "<u>Consultant</u>"), and FINLAY FINE JEWELRY CORPORATION, a Delaware corporation with a principal place of business at 529 Fifth Avenue, New York, New York 10017 (the "<u>Merchant</u>").

## R E C I T A L S:

WHEREAS, the Merchant desires to retain Consultant to provide consulting services to Merchant with respect to the management and disposition of the Merchandise and FF&E (each as defined below) in the context of a "store closing" or similar theme sale (the "<u>Sale</u>") at Merchant's fifty (50) retail store locations identified on <u>Exhibit A</u> attached hereto (each individually, a "<u>Store</u>", and collectively, the "<u>Stores</u>" or the "<u>Closing Locations</u>"); and

WHEREAS, Consultant is willing to serve as the Merchant's consultant for the purpose of providing such consulting services, upon the terms and conditions and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. <u>Definitions</u>

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"<u>Additional Goods</u>" shall mean such additional goods of like kind and quality that are included in the Sale on a consignment basis from Consultant to supplement the Sale; which goods shall be subject to the reasonable approval of the Merchant and Credit Agreement Agent.

"<u>Additional Goods Expenses</u>" shall mean the sum of (i) the Memorandum Price for the Additional Goods sold as part of the Sale; plus (ii) the incremental expenses associated with the sale of the Additional Goods, including, but not limited to (a) store-level employee commissions; (b) Merchant's property insurance premium costs attributable to the Additional Goods; (c) any costs associated with the return of Additional Goods that were not sold during the Sale; and (d) such other costs or expenses incurred in connection with the inclusion and sale of the Additional Goods (provided however, Merchant and Consultant do not intend to allocate internal store-level or corporate-level expenses as an Additional Goods Expenses); in each case solely to the extent of the pro-rata incremental expenses that may accrue as a result of the sale of the Additional Goods (or as a result of the inclusion of the Additional Goods in the Sale, even if not sold).

"<u>business day</u>" shall mean any day that is not a Saturday, Sunday or a day on which banks are required or permitted to be closed in the State of New York.

1

"Cost Value" shall mean, (i) with respect to each item of domestic Merchandise (other than Defective Merchandise (including Designated DC Merchandise that is categorized by Merchant and Consultant as being Defective Merchandise)), the Cost Value used by the Company to value each item sold at the time of sale (determined by applicable merchant accounting for such item of Merchandise), which amount does not include freight or any additional vendor credits; and (ii) with respect to imported Merchandise, the Cost Value used by the Company to value each item sold at the time of sale (determined by applicable merchant accounting unit for such item of Merchandise), which amount reflects the vendor's invoice cost, which amount includes duty, freight and other costs that the vendor incurs with landing the product in the United States and into our distribution centers. With respect to Defective Merchandise, "Cost Value" shall mean the value that Merchant and Consultant reasonably agree (it being the parties expectation that Defective Merchandise for which Merchant and Consultant cannot agree on a "Cost Value" will be identified as such and disposed of as part of the VOB Sales process).

"Credit Agreement" shall have the meaning set forth in Section 12.10(D) of this Agreement.

"Credit Agreement Agent" shall have the meaning set forth in Section 12.10(D) of this Agreement.

"Defective Merchandise" means any item of inventory that is not saleable for its intended purpose because it is dented, worn, cracked, scratched, faded, broken sets, or merchandise affected by other similar defects rendering it not first quality (such as, for example, watches that are not running, or pierced earrings without backs), and as to which Consultant and Merchant mutually agree on its value to define its Cost Value.

"Designated DC Merchandise" means (i) those items of inventory located in Merchant's distribution center that have been returned by the Stores or by Merchant's licensed departments for various reasons and included in the Sale; and/or (ii) those items of inventory located in Merchant's distribution center(s) as identified to Consultant, in each case which may be included in the Sale with the mutual consent of Merchant and Consultant.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging for the purpose of putting such item on display but not customarily sold or saleable by Merchant, which goods are not otherwise damaged or defective. For the avoidance of doubt, Merchandise created solely for display, not saleable in the ordinary course of business shall not constitute Display Merchandise and shall not be sold by Consultant.

"Gross Sales" shall mean (i) all proceeds derived from the sale of Merchandise during the Sale; plus (ii) an amount equal to Merchant's Gross Margin Share Amount (in each case excluding amounts paid for sales, excise, and gross receipts taxes); plus (iii) all proceeds of fire, flood or other insurance covering the Merchandise and Additional Goods in the event of a casualty event affecting the Merchandise or Additional Goods during the Sale; provided, however, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Merchant prior to the Sale Commencement Date or after the Sale Termination

2

Date; provided, further, however, the notwithstanding the immediately foregoing clause, (a) Consultant shall have the right, for an approximate three (3) week period of time following the Sale Termination Date, to assist Merchant in conducting bulk, wholesale, or similar sales/auctions of the Merchandise ("VOB Sales"), and all proceeds realized upon such VOB Sales shall be included in the calculation of Gross Sales for purposes of calculating Consultant's entitlement to any Success Fee hereunder and (b) with respect to layaway sales, Gross Sales shall include proceeds tendered by the customer at any time to obtain possession of the subject layaway merchandise.

"Memo Merchandise" shall mean all goods held by Merchant on memo, on consignment, or as bailee.

"Memorandum Price" shall mean the actual vendor cost paid by Consultant for Additional Goods; plus any associated shipping or other third-party expenses to have such Additional Goods delivered to/from the Closing Locations (whether or not such goods are actually sold as Additional Goods); but exclusive of any "lift" or other Consultant handling fees or expenses.

"Merchandise" shall mean: (i) all saleable finished-goods inventory (it being agreed that loose stones shall be considered "finished-goods") that is owned by Merchant and located at the Stores as of the Sale Commencement Date; (ii) all saleable finished-goods Designated DC Merchandise received in the Stores on or before the Merchandise Receipt Deadline, but only in the respective amounts and mix as Consultant and Merchant shall mutually agree; (iii) Transfer Goods received on or before the Merchandise Receipt Deadline and (iv) Defective Merchandise, Display Merchandise, and Layaway Merchandise that is not picked up by customer on or prior to the Layaway Pick-Up Date; provided, however, Merchant and Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) Defective Merchandise for which Merchant and Consultant cannot agree upon a Cost Value; (3) Memo Merchandise, unless otherwise agreed to by Merchant and Consultant; (4) Removed Goods; (5) FF&E; and (6) the Additional Goods.

"Merchandise Receipt Deadline" shall mean April 30, 2009 (unless otherwise mutually agreed by Merchant and Consultant).

"Layaway Merchandise" means all items of Merchandise held at the Stores on layaway, in each case, where the goods subject to layaway are properly identified, segregated, and in a condition as described in the documentation.

"Leases" shall mean all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Merchant has the right to occupy or utilize the Closing Locations.

"Payment Date" shall have the meaning set forth in Section 12.10(A) of this Agreement.

Removed Goods" means those items of merchandise identified by Merchant and substantially similar to the merchandise identified on Exhibit B annexed hereto, that Merchant has transferred, or will transfer from the Stores to Merchant's on-going stores and/or distribution

3

centers on or before the seventh (7th) day following the Sale Commencement Date or such other date as Consultant and Merchant mutually agree (the "Merchandise Removal Deadline").

"Sale Commencement Date" shall mean the first business day after execution and delivery of this Agreement (or such other date as shall be agreed by Merchant and Consultant).

"Sale Expenses" shall mean, with respect to the Sale of Merchandise and Additional Goods from the Closing Locations, the following Store-level operating expenses incurred in connection with the Sale, limited to the following: (i) advertising expenses (including direct media costs, agency fees and production costs), and signage and signwalkers used in connection with the Sale, in each case to the extent approved by Consultant, and subject to the limitations set forth in the Budget) (collectively, "Advertising Costs"); (ii) payroll (including any store-level commissions) and related employee benefits and payroll taxes (with any such benefits being capped at 21.8% of base payroll) to the extent related to personnel which Consultant requests be available for the Sale ("Payroll Costs"); (iii) security costs associated with the Sale, the Merchandise, and the Additional Goods, in each case to the extent requested by Consultant or required by Merchant's insurance policies; (iv) credit card processing fees for Merchandise; (v) Store-level employee bonuses mutually approved by Merchant and Consultant prior to the execution of this Agreement; (vi) occupancy and occupancy-related costs relative to the Closing Locations, limited on a per Store and per diem basis to the respective amounts set forth on Exhibit C; (vii) insurance amounts (except as may be paid by Consultant as an Additional Goods Expense); (viii) telephone charges; (ix) Consultant's reasonable and documented legal expenses associated with the transactions contemplated hereby; (x) all Supervisor Costs (subject to the limitations set forth in the Budget), (xi) licensing and permitting fees and expenses, (xii) costs of transferring Merchandise between Closing Locations at the request of Consultant; and (xiii) the costs of selling, transferring and/or consolidating back to the distribution center or corporate offices of the goods that are the subject of VOB Sales

"Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

"Sale Termination Date" shall mean September 30, 2009, or with respect to any one or more Stores such earlier date(s) as determined by Consultant upon seven (7) days notice to Merchant.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Shortfall Amount" shall have the meaning set forth in Section 12.10(D) of this Agreement.

"Store Employees" shall mean those employees of the Merchant retained to conduct the Sale following consultation with Consultant; provided however that Merchant shall exercise commercially reasonable best efforts to ensure that there are sufficient Store Employees to reasonably conduct the Sale (as to number, and sales and management quality, with reference to Merchant's historic practices and periods); provided further that in the event Merchant nevertheless is unable to ensure that there are sufficient Store Employees to reasonably conduct

4

the Sale (as to number, and sales and management quality, with reference to Merchant's historic practices and periods), Merchant shall not be deemed in breach of this Agreement and Consultant shall reasonably and equitably increase the Budget to reflect the Consultant's need to obtain qualified temporary help/additional supervisors to adequately staff the Stores.

"Supervisor(s)" shall mean the individual(s) whom Consultant shall engage to provide Services in the Stores to Merchant in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall have the meaning set forth in Section 2.3 of this Agreement.

"Transfer Goods" shall mean all of the goods identified on Exhibit D hereto, which are goods being transferred from Merchant's on-going stores to the Closing Locations.

"UCC" shall have the meaning set forth in Section 12.10(A) of this Agreement.

## 2. Consulting Services

2.1     Merchant hereby retains Consultant and Consultant hereby agrees to serve as an independent consultant to the Merchant in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Consultant shall serve as the sole and exclusive consultant to the Merchant relative to the conduct of the Sale at the Closing Locations throughout the Sale Term; provided, however, notwithstanding any term or provision of this Agreement to the contrary, if any, Merchant shall retain the discretion, in the exercise of its sole discretion, from time-to-time to engage such other consultants, agents or advisors as Merchant determine appropriate to provide services with respect to stores or other locations not the subject of this Agreement.

2.2     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, Consultant shall provide Merchant with the following Services with respect to the conduct of the Sale:

(i)     provision of approximately the number and types of Supervisors described in that certain e-mail correspondence dated March 17, 2009 at 17:26:30 with the subject line entitled "Supervisors" from Rick Edwards to Maura I. Russell to supervise and assist Merchant in its conduct the Sale as further described in Section 2.3 below, including such lead, regional, financial, field and loss prevention Supervisors as needed and mutually agreed, to assist Merchant in conducting the Sale and oversee the Sale process. All Supervisors shall have jewelry-specific experience conducting "going-out-of-business," "store closing," "bankruptcy liquidation," or similarly themed sales and shall act in a professional manner; provided that the determination of the number of Supervisors supplied for the Sale shall be determined by Consultant following consultation with Merchant;

(ii)     provide Merchant with such oversight, supervision and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and FF&E from the Closing Locations as may be required in order to seek to maximize Gross Sales;

(iii) subject to any restrictions as may appear in any affected Leases, Consultant may assist Merchant in the conduct of an auction aimed at disposing of Merchandise that is deemed by Consultant (following consultation with Merchant) to be not salable through ordinary course in the Stores as part of the Sale; provided that the date, time and place of any such auction shall be determined by Consultant following consultation with Merchant;

(iv) recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale, it being understood that the Sale will be advertised as a "Store Closing", "Everything on Sale" or similar handles throughout the term of the Sale, subject to applicable restrictions as may appear in any affected Lease or under applicable state and local law. Consultant will work with Merchant and its landlords during the Sale Term concerning the conduct of the Sale and with respect to any restrictions as may appear in the Leases affecting the conduct of the Sale;

(v) advise Merchant as to appropriate discounting of Merchandise, appropriate staffing levels for the Closing Locations, and appropriate bonus and incentive programs for Store Employees;

(vi) assist Merchant in the formulation and implementation of a security program designed to protect the Merchandise from theft or other shortages;

(vii) recommend and implement the transfer and balancing of Merchandise between the Closing Locations to maximize results during the Sale; and

(viii) provide such other related services deemed necessary or prudent by Merchant and Consultant under the circumstances giving rise to the Sale.

2.3    (a)    In connection with the Sale, Consultant shall directly retain and engage the Supervisors. The Supervisors are independent contractors engaged by Consultant and are not and shall not be deemed to be employees or agents of Merchant in any manner whatsoever; nor do the Supervisors have any relationship with Merchant by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Merchant for the Supervisors. During the Sale Term, the Supervisors shall perform Services during normal Closing Location operating hours and for the period of time prior to the Closing Locations' opening and subsequent to the Closing Locations' closing, as required in connection with the Sale, in Consultant's discretion.

(b)    In consideration of Consultant's engagement of the Supervisors, Merchant agrees to pay Consultant, as a Sale Expense, the following Supervisor-related costs and expenses (collectively, the "Supervisor Costs"): (i) the sum of $3,300 per week of the Sale Term for no more than five (5) of the Supervisors; (ii) the sum of $2,400 per week of the Sale Term for the Supervisors (pro-rata for any part-time Supervision)(which in each case represents Consultant's actual costs); (iii) reasonable and documented travel expenses of the Supervisors between Closing Locations during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iv)

6

reasonable Supervisor bonuses to be determined by Consultant, not to exceed fifty percent (50%) of the actually incurred Supervision fees paid at the weekly rates set forth above in the aggregate. In connection with Consultant's conduct of the Sale and its engagement of the Supervisors in connection therewith, not later than two (2) business days following the parties' execution and delivery of this Agreement Consultant shall furnish Merchant with a copy of Consultant's proposed bonus plan for the Supervisors. Merchant shall reimburse Consultant for all Supervisor Costs weekly, in advance, based upon invoices or other documentation reasonably satisfactory to Merchant. Consultant shall calculate the amount of any earned Supervisor bonus within ten (10) days after the conclusion of the Sale. Merchant shall also reimburse Consultant on a weekly basis for the accrued Supervisor bonuses for such week (as reasonably determined by Consultant), in advance, based upon invoices or other documentation reasonably satisfactory to Merchant, with such amount to be held by Consultant in accordance with this Section 2.3(b) and any such amount not distributed as Supervisor bonuses shall be refunded to Merchant within one (1) business day after the Final Settlement.

2.4     Title to all Merchandise (other than Additional Goods as provided in Section 12.10 below) shall remain with Merchant at all times during the Sale Term until such Merchandise is sold. Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Merchant, Merchant expressly acknowledges that Consultant is not guaranteeing the results of the Sale. All sales of Merchandise in the Closing Locations shall be made on behalf of Merchant. Merchant further agrees that responsibility for the handling of any goods, inventory or other merchandise held by Merchant and located in the Closing Locations under any consignment, sale or return, or other similar agreement shall lie exclusively with Merchant, and Consultant shall have no responsibility with respect thereto.

## 3.     **Expenses; Consultant's Fees**

3.1     Sale Expenses. Merchant and Consultant have agreed on a pro forma estimated budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "Budget") in the form and content annexed hereto and made a part hereof as Exhibit E. In connection with the Sale, Merchant shall be responsible for the payment of all expenses incurred in connection with the Sale, including without limitation all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in Section 9.1 below). Neither Merchant nor Consultant shall incur Supervisor Costs or Advertising Costs (in each case attributable to the Closing Locations) in excess of the aggregate amounts for such categories set forth on the Budget without the prior written consent of the other party; and Consultant agrees that it shall be solely responsible to fund any Supervisor Costs and/or Advertising Costs incurred in the conduct of the Sale in excess of the aggregate amount of such costs as reflected on the Budget. In addition, Consultant shall not recommend that Merchant incur Payroll Costs in excess of the amount reflected on the Budget for Payroll Costs (but Consultant shall not be responsible for funding any Payroll Costs, whether under or over the Budgeted amount therefor). It is anticipated that Consultant will advance funds for certain categories of Sale Expenses (such as Supervision Costs and Advertising Costs); and Merchant agrees that it shall reimburse Consultant therefor (in advance subject to reconciliation) in connection with each weekly reconciliation provided for in Section 4.1 hereof upon presentation of invoices and statements for such expenses (provided *however* Consultant shall provide copies

of such invoices and statements to Merchant at least two business days prior to the date by which Merchant is required to make such advance payment), which reimbursement shall be in addition to any Base Consulting Fee, Success Fee and/or FF&E Fee earned and payable hereunder. Notwithstanding the foregoing expense reimbursement advance, Merchant shall have the opportunity to review and reconcile all Supervision Costs, Advertising Costs and other expense reimbursements or advances as part of the final reconciliation of the sale.

3.2    Consultant's Compensation.

(a)    Base Consulting Fee. In consideration of Consultant's provision of the Services provided for hereunder, Merchant shall pay to Consultant, from Sale proceeds, a Consulting Fee in an amount equal to five hundred thousand dollars ($500,000) (the "Base Consulting Fee"). The Base Consultant Fee shall be payable in five (5) equal weekly installments of one hundred thousand dollars ($100,000) each, commencing on the date hereof and continuing on the first four (4) following weekly reconciliations contemplated by Section 4.1.

(b)    Success Fee. (i) To the extent that Net Sales Proceeds (defined as Gross Sales *less* Sale Expenses) are between fifty-seven percent (57%) ("Performance Hurdle") and sixty percent (60%) of the aggregate Cost Value of the Merchandise (the "Second Performance Hurdle"), Merchant shall pay Consultant an amount equal to seven and one-half percent (7.5%) of the Net Sales Proceeds between the Performance Hurdle and the Second Performance Hurdle; plus (ii) to the extent that Net Sales Proceeds are between the Second Performance Hurdle and sixty-three percent (63%) (the "Third Performance Hurdle"), Merchant shall pay Consultant (in addition to the amounts payable under clause (i) above) an amount equal to ten percent (10%) of the Net Sales Proceeds between the Second Performance Hurdle and the Third Performance Hurdle; plus (iii) to the extent that Net Sale Proceeds exceed the Third Performance Hurdle, a Merchant shall pay Consultant (in addition to the amounts payable under clauses (i) and (ii) above) an amount equal to twelve and one-half percent (12.5%) of the Net Sales Proceeds in excess of the Third Performance Hurdle (the sum of (i), (ii) and (iii) collectively, the "Success Fee"), which Success Fee amount shall be in addition to the Base Consulting Fee earned hereunder (and all other amounts contemplated to be paid/reimbursed by Merchant to Consultant hereunder). For the avoidance of doubt, the Success Fee shall be calculated only on an incremental basis above the respective/applicable Performance Hurdles and not on a back to the "first dollar" of Net Sales Proceeds basis.

(c)    For purposes of calculating Gross Sales, Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Closing Location. Register receipts shall show for each item sold the retail price (as reflected on Merchant's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. All such records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

3.3    Fixtures Disposition. (a) In addition to the consulting Services provided for herein, with respect to furniture, fixtures and equipment owned by Merchant and located at the Stores (collectively, the "FF&E"), Consultant shall sell the FF&E in all Stores for Merchant's

8

benefit. Consultant shall advertise in the context of advertising for the Sale that items of FF&E at the Stores are available for sale, and shall contact and solicit known purchasers and dealers of furniture and trade fixtures. In consideration of providing such services, Consultant shall retain twenty-five (25%) of the net receipts (net only of applicable sales taxes and agreed budgeted sale expenses, if any) from all sales or other dispositions of FF&E (the "FF&E Fee"). In addition, Merchant shall reimburse Consultant for Consultant's reasonable out of pocket expenses incurred in connection with the sale or other disposition of the FF&E which have been previously approved by Merchant (including, without limitation, costs of advertising specifically attributable to FF&E sales) (the "FF&E Budget"). Consultant shall have no liability to Merchant or any third party for its failure to sell any or all of the FF&E, and shall have the right to abandon such unsold FF&E at the Stores on the applicable Sale Termination Date, provide that such abandonment shall be done in a neat and orderly fashion.

4.     **Sale Proceeds; Weekly Settlement**

4.1     Merchant shall collect all proceeds of sales of Merchandise and FF&E through the Sale and deposit the same in deposit accounts established by Merchant for the deposit thereof (which may be Merchant's existing Store-level deposit accounts) (the "Sale Accounts"). Merchant shall, upon request, deliver to Consultant and Credit Agreement Agent account statements and such other information relating to the Sale Accounts reasonably requested by Consultant or Credit Agreement Agent. On Wednesday of each week, commencing on the first Wednesday following the Sale Commencement Date, Consultant and Merchant shall reconcile the results of the Sale for the prior week, including, without limitation, Gross Sales of Merchandise, sales of FF&E, sales of Additional Goods, Sale Expenses (subject to the Budget), FF&E sale-related expenses (subject to the FF&E Budget), Supervisor Costs, and any Base Consulting Fee, Success Fee, and FF&E Fee earned and payable hereunder.

4.2     No later than ten (10) business days following the end of the Sale Term (or as soon as practicable thereafter) the parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement ("Final Settlement"), including, without limitation, the determination and payment of any fees due Consultant and all reimbursements and payments contemplated hereby.

5.     **Closing Location Employees**

5.1     Consultant and Merchant shall cooperate to retain the employees of the Merchant, as designated by Consultant from time-to-time, to be utilized to conduct the Sale at the Stores during the Sale Term. To the extent practicable, such employees shall remain employees of the Merchant, and Consultant shall have no liability to the Store Employees (including any of Merchant's former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, WARN Act payments, or any other expenses or liability arising from Merchant's or Merchant's employment of such Store Employees prior to, during, and subsequent to the Sale. Consultant shall not change the terms of employment of any Store Employees without Merchant's prior written consent.

6.     **Representation And Warranties Of Consultant**

6.1    Consultant hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Consultant has taken all necessary action required to authorize the execution, performance and delivery of this agreement, and to consummate the transactions contemplated hereby.

(b)    This Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c)    No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

## 7.    **Representations And Warranties Of Merchant**

7.1    Merchant hereby represents, warrants and covenants in favor of Consultant as follows:

(a)    Merchant has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)    This Agreement is a valid and binding obligation of the Merchant enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c)    No action or proceeding has been instituted or, to Merchant's knowledge, threatened, affecting the consummation of this Agreement or the transactions contemplated herein.

## 8.    **Affirmative Duties Of Consultant**

8.1    Consultant shall assist Merchant in obtaining all required permits and governmental consents required in order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances, in each case.

8.2    The Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

10

(i)     Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

(iii)     any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Merchant or from a breach of the terms hereof by Merchant;

(iv)     the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor; and

(v)     any claims relating to the Additional Goods.

8.3     In connection with the VOB Sales process, Consultant shall cooperate with Merchant in seeking to maximize the recovery of any Merchandise proposed to be sold by means of VOB Sales, and shall allow Merchant a "right of first offer" with respect to any such Merchandise so long as such "right of first offer" does not unreasonably interfere with any third-party VOB Sales offers obtained/to be obtained by Consultant.

## 9.     **Affirmative Duties Of Merchant**

9.1     Merchant shall be solely liable for, and shall pay when due (except as provided for below), (i) all expenses (including, without limitation, Sale Expenses and FF&E sale-related expenses (subject to the FF&E Budget), but excluding (x) Additional Goods Expenses, which shall be the expense of the Consultant; (y) Supervisory Costs and/or Advertising Costs in excess of the amounts set forth in the Budget, and (z) FF&E expenses in excess of the amounts set forth on the FF&E Budget) which are necessary to conduct, or incurred in the conduct of, the Sale, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Closing Locations, Store Employees and any other agents and representatives of Merchant, and (ii) all Supervisor Costs and Consultant's fees payable hereunder (provided however that as stated above, Consultant shall be solely responsible to fund the Additional Goods Expenses, and any Supervisor Costs and/or Advertising Costs incurred in the conduct of the Sale in excess of the aggregate amount of such costs as reflected on the Budget, and any FF&E expenses in excess of the amounts set forth on the FF&E Budget).

9.2     Merchant shall prepare and process all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities; and Merchant shall pay the same when due. Consultant shall provide all assistance reasonably required or requested by Merchant in connection with the

11

preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities.

9.3     Without limiting any other term or provision of this Agreement, during the Sale Term, Merchant shall provide Consultant, at no cost or expense to Consultant, with (i) central administrative services necessary to administer the Sale, (ii) employees at the Closing Locations (to the extent reasonably agreed upon by Merchant and Consultant necessary to implement and conduct the Sale), and (iii) peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Merchant's corporate offices for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby.

9.4     Consultant and Merchant shall honor gift cards and merchandise credits at the Closing Locations in accordance with store-level operation procedures to be mutually agreed upon between Merchant and the Consultant. No gift cards shall be sold from the Closing Locations during the Sale Term.

9.5     Merchant shall collect all sales taxes and shall be solely responsible for reporting and pay the same to the appropriate taxing authorities in accordance with applicable law; provided that Consultant shall provide all assistance reasonably required or requested by Merchant in connection with the preparation and processing of any such reports, forms, certificates, and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities.

9.6     Merchant shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(i)     Merchant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)     any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(iii)     any consumer warranty or products liability claims relating to any Merchandise (but excluding the Additional Goods);

(iii)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; and

(v)     the negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents or representatives.

## 10.    Insurance; Risk of Loss

10.1    Merchant shall maintain throughout the Sale Term, (i) insurance with respect to the merchandise at the Stores and any storage facility (to the extent identified in Exhibit A hereto) in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance (as applicable to the Additional Goods).  Merchant shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors.

10.2    Consultant shall maintain throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive public liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Closing Locations, and shall cause Merchant to be named an additional insured with respect to such policies.

10.3    Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Closing Locations before, during and after the Sale Term, except to the extent any such claim arises from the  negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

**11.    Additional Stores.**    At any time during the first thirty (30) days after the Sale Commencement Date, Merchant shall have the right to include some of the on-going stores (the "Additional Stores") in the Sale, which may be exercised multiple times.  In the event Merchant designates one or more Additional Stores for inclusion in the Sale, then (a) the Budget and the FF&E Budget shall be adjusted to account for the increased Expenses associated with the inclusion of the Additional Stores in the Sale; and (b) the Sale Termination Date at the Additional Stores shall be extended by the number of days between the Sale Commencement Date at the Stores and the date Merchant designates a particular Additional Store to be included in the Sale.

## 12.    Miscellaneous

12.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

(i)     In the case of Consultant:

13

Gordon Brothers Retail Partners, LLC
101 Huntington Avenue, 10th Floor
Boston, MA 02199
Attention: Michael Chartock
Fax: 617-531-7906
Email: mchartock@gordonbrothers.com


With a copy to:

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Attn: Steven J. Reisman
Fax:   (212) 697-1559
Email: sreisman@curtis.com


(ii)   In the case of Merchant:

FINLAY FINE JEWELRY CORPORATION
529 Fifth Avenue
New York, NY  10017
Attn:   Arthur E. Reiner
        Joseph M. Melvin
        Bonni G. Davis
Fax:   212-808-0349
Email: areiner@fnly.com
        jmelvin@fnly.com
        bdavis@fnly.com

With a copy to:

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Lori R. Fife
        Shai Waisman
Tel:   (212) 310-8000
Fax:   (212) 310- 8007
Email: Lori.Fife@weil.com
        Shai.Waisman@weil.com


ASSET DISPOSITION ADVISORS, LLC
2435 Matterhorn Drive
Wexford, PA  15090

14

Attn: Barry Gold
Paul Traub
Maura I. Russell
Email barrygold@aol.com
paultraub@aol.com
moruss@aol.com

(iii)  In the case of Credit Agreement Agent:

GENERAL ELECTRIC CAPITAL CORPORATION
401 Merritt 7
Norwalk, CT  06851
Attention:  Finlay Account Manager
Telecopier No:  203-956-4002
Telephone No:  203-229-1800

with copies to:

LATHAM & WATKINS LLP
233 S. Wacker Drive
Suite 5800
Chicago, Illinois  60606
Attention:  David K. Rathgeber
Telecopier No:  312-993-9767
Telephone No:  312-876-7700

and

GENERAL ELECTRIC CAPITAL CORPORATION
401 Merritt 7
Norwalk, CT  06851
Attention:  Corporate Counsel - Corporate Lending
Telecopier No:  203-956-4001
Telephone No:  203-229-1800

Notices shall be deemed to have been duly given on the date of service if served personally on the party (including, without limitation, service by overnight courier service) to whom notice is to be given; on the third day after mailing if mailed to the party to whom notice is to be given by prepaid registered or certified mail to the address set forth above; or on the date of transmission if sent by facsimile to the facsimile number set forth above, which facsimile is confirmed by a machine generated confirmation.  Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

12.2 <u>Governing Law</u>. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction.

12.3 <u>Severability</u>. In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

12.4 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by Merchant and Consultant.

12.5 <u>Assignment</u>. Neither Merchant nor Consultant shall assign this Agreement without the express written consent of the other. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

12.6 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

12.7 <u>Independent Contractor</u>. Nothing contained herein shall be deemed to create any relationship between Consultant and Merchant other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

12.8 <u>Termination</u>. This Agreement shall terminate upon the completion and approval of the Final Settlement (as provided in Section 4.2 above); provided, however, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder. If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than three (3) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving such notice shall have three (3) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by Merchant, Consultant shall be entitled to be paid any Consulting Fee, Success Fee, and the FF&E Fee earned and accrued through the date of termination, together with reimbursement of any Sale Expenses or FF&E sale-related expenses incurred in conformity with the Budget and FF&E Budget, respectively, through the date of such termination. The foregoing notwithstanding, if Merchant fails to make any undisputed payment to Consultant as required by this Agreement individually or in the aggregate (such aggregate unpaid amount, the "<u>Merchant Unpaid Amount</u>") in excess of $50,000, and such failure continues for two (2) business days after the later of (i) Consultant's delivery of written notice thereof to Merchant and Credit Agreement Agent and (ii) the day of the next weekly reconciliation provided for in Section 4.1 which falls after the date such payment (or the latest of such payments, as applicable) was required to have been made (or, in the case of a payment due on a weekly reconciliation day, such day), then such failure shall constitute a material default

16

under this Agreement, which shall entitle Consultant to suspend or terminate performance of its obligations under this Agreement and, without limitation of its other rights and remedies, exercise all rights and remedies of a secured party under the UCC with respect to the Additional Goods; provided, however, that for purposes of determining whether the Merchant Unpaid Amount exceeds such $50,000 threshold, the Consultant Reimbursement Amount (as defined below) shall be deducted from the Merchant Unpaid Amount, and Consultant shall be entitled to set-off the Consultant Reimbursement Amount against the Merchant Unpaid Amount. For purposes of this Agreement, the term "Consultant Reimbursement Amount" means the sum of (i) the amount held by the Consultant which relates to the sixty-five percent (65%) of Merchant's Gross Margin Share Amount which is required to be paid to Merchant under Section 12.10(A) in connection with the next weekly reconciliation but which has not yet been paid and (ii) the amount which the Consultant is required to reimburse Merchant (based on the most recently completed weekly reconciliation) for Additional Goods Expenses which have actually been paid by Merchant, in each case calculated at the time Merchant has failed to pay the applicable Merchant Unpaid Amount. The foregoing shall be in addition to Consultant's rights under Section 12.10(G).

12.9    Returned Merchandise. Merchant and Consultant shall accept returns of Returned Merchandise sold and delivered to customers prior to the Sale Commencement Date in a manner consistent with Merchant's customary practices and policies in effect on the Sale Commencement Date. All customer requests for cash refunds or merchandise credits with regard to sales completed prior to the Sale Commencement Date shall be processed in accordance with Merchant's prior practices. Merchant and Consultant shall be obligated to maintain a detailed returned merchandise log, including copies of all relevant merchandise receipts and credits, as well as mark the affected merchandise in such a fashion so as to render such merchandise readily identifiable by Merchant and Consultant.

12.10    Additional Goods.

(A)    Consultant may (but shall not be required to) supplement the Sale at the Stores with Additional Goods (as are reasonably approved by Merchant and Credit Agreement Agent), at Consultant's expense, and Consultant shall be responsible for the Additional Goods Expenses. Sales of Additional Goods shall be run through Merchant's cash register systems, provided however, Consultant shall mark the Additional Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Goods from the sale of Merchandise. Consultant and Merchant shall also cooperate so as to ensure that the Additional Goods are marked in such a way that a reasonable consumer could identify the Additional Goods as non-Merchant goods. Consultant and Merchant intend that the transactions relating to the Additional Goods are, and shall be construed as, a true consignment from Consultant to Merchant in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations under Section 12.10(B) below to pay to Merchant the Merchant's Gross Margin Share Amount and amounts received and applied or held by Credit Agreement Agent as described below, at all times and for all purposes the Additional Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Goods or their proceeds. Merchant and Consultant shall reconcile the sales of Additional Goods and the Additional Goods Expenses on a weekly

17

basis, and Merchant shall be entitled to payment of sixty five percent (65%) of the Merchant's Gross Margin Share Amount on a weekly basis, with the remaining thirty five percent (35%) of Merchant's Gross Margin Share Amount to be paid as part of the Final Settlement. The Additional Goods shall at all times remain subject to the exclusive control of Consultant and, commencing no later than the third (3rd) business day after which Additional Goods are first offered for sale in any of the Closing Locations, Merchant shall report to Credit Agreement Agent and Consultant on each business day the aggregate sales of Additional Goods made on each day since the prior report, or in the case of the first such report the initial amount of sales of Additional Goods; provided that:

(x) such reports shall be subject to correction by Consultant in the case of any error or omission (i) at any time within the first 30 days after any Additional Goods are first offered for sale in any of the Closing Locations and (ii) thereafter within five (5) business days after the delivery of any such report to the Credit Agreement Agent, in each case, by providing written notice thereof to the Credit Agreement Agent; and

(y) if Merchant does not timely deliver any such report, the Consultant shall provide the Credit Agreement Agent with such report no later than (i) with respect to any sales occurring within the first 30 days after any Additional Goods are first offered for sale in any of the Closing Locations, five (5) business days after the expiration of such 30 day period, and (ii) with respect to all other sales, within five (5) business days after the date Merchant was required to so deliver such report.

Merchant shall wire to Consultant on each Tuesday and Friday (each a "Payment Date"), an amount equal to all proceeds received by Merchant from the sale of the Additional Goods and not previously paid to Consultant. Merchant shall give Consultant reasonable access to its books, records and systems for the purpose of verifying (and if necessary, preparing) the daily reports. Merchant shall, at Consultant's expense (and not as a Sale Expense), insure the Additional Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Merchant acknowledges that the Additional Goods shall be consigned goods under Article 9 of the Uniform Commercial Code (the "UCC") and hereby authorizes Consultant to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional Goods as consigned goods thereunder and the Merchant as the consignee therefor.

(B)     Consultant shall pay Merchant an amount equal to seventy-five percent (75%) of the Additional Goods Gross Margin ("Merchant's Gross Margin Share Amount"). Weekly installments of Merchant's Gross Margin Share Amount shall be paid in accordance with Section 12.10(A) and the balance of such amounts shall be paid in connection with the Final Settlement. As used herein, the term "Additional Goods Gross Margin" shall mean the gross proceeds of Additional Goods actually sold in the Stores during the Sale Term which were received by Consultant, less Additional Goods Expenses; it being expressly understood that Consultant shall not be entitled to apply any "lift" to the Additional Goods.

(C)     In order to adequately protect Consultant's right, title and interest in and to the Additional Goods and proceeds thereof, and as a condition precedent to Consultant's inclusion of

Additional Goods in the Sale in accordance with this Agreement, Merchant (and its applicable subsidiaries and affiliates), Consultant and Credit Agreement Agent shall, within seven (7) days of the date hereof, enter into a consignment agreement reflecting the terms hereof and such other terms and conditions as are customary for consignment agreements of this nature, all in form and substance reasonably satisfactory to Merchant, Consultant and Credit Agreement Agent.

(D)     Merchant acknowledges that proceeds from all sales (including sales of the Additional Goods) shall be deposited into deposit accounts subject to the sole dominion and control of Credit Agreement Agent and that Credit Agreement Agent is authorized to apply amounts received in such accounts on a daily basis to amounts outstanding under the Credit Agreement referred to below. Credit Agreement Agent consents to the payments to Consultant based on reported sales of the Additional Goods as described above and Credit Agreement Agent agrees solely to the extent (i) that Credit Agreement Agent shall have received proceeds from the sale of such Additional Goods (it being agreed that amounts received by the Credit Agreement Agent with respect to sales at the Closing Locations that are not identifiable proceeds of collateral of the Credit Agreement Agent shall be deemed to be proceeds from the sale of Additional Goods previously reported as being sold as provided herein), (ii) of sales of Additional Goods reported to the Credit Agreement Agent as provided in subsection (A) above and (iii) that payment for the Additional Goods has not been made to Consultant, the Credit Agreement Agent shall pay, or cause to be paid, to Consultant in accordance with subsection (E) below the amounts to which the Consultant is entitled with respect to sales of Additional Goods (each such amount obligated to be paid by the Credit Agreement Agent being a "Shortfall Amount"). The term "Credit Agreement" means that certain Fourth Amended and Restated Credit Agreement dated as of November 9, 2007 among, among other parties, the Merchant, Carlyle & Co. Jewelers LLC, L. Congress, Inc, Finlay Enterprises, Inc., certain additional subsidiaries thereof, the lenders party thereto, and General Electric Capital Corporation, as Agent for such lenders (in such capacity the "Credit Agreement Agent"), as the same has been and may hereafter be amended, supplemented, amended and restated or otherwise modified from time to time.

(E)     If any Shortfall Amount shall exist, Consultant shall have the right to immediately demand payment of 100% thereof from Credit Agreement Agent. Consultant's demand from Credit Agreement Agent shall (i) set forth the Shortfall Amount which Merchant was required to pay to Consultant on the applicable Payment Date, (ii) state that Merchant has not made payment of such amount, and (iii) instruct Credit Agreement Agent to make payment of such amount to an account designated by Consultant therein. Within three (3) business days after the receipt of such notice, subject to the limits set forth in subsection (D) above, Credit Agreement Agent shall make payment of such Shortfall Amount to Consultant. Credit Agreement Agent acknowledges and agrees that its obligations under this Section 12.10(E) constitute an absolute and irrevocable payment obligation in favor of Consultant which shall remain in full force and effect without regard to (1) the validity of the Credit Agreement or Credit Agreement Agent's rights to reimbursement or indemnity thereunder from the other lenders party to the Credit Agreement or the Merchant or its affiliates, (2) the Merchant's availability of credit under the Credit Agreement, (3) whether the Merchant is in default under the Credit Agreement or is subject to any bankruptcy or insolvency proceedings, or (4) any other defense, offset or counterclaim

19

which Credit Agreement Agent may have against Consultant (except as expressly set forth in this Section 12.10).

(F)     Merchant agrees with Credit Agreement Agent that (i) any and all amounts paid or owing by Credit Agreement Agent pursuant to this Agreement (other than payments made from amounts set aside as described in clause (iii) below) shall be promptly paid or reimbursed by Merchant to Credit Agreement Agent and each such payment or reimbursement obligation shall constitute part of the "Obligations" under and as defined in the Credit Agreement, (ii) such Obligations are secured by all of the collateral granted pursuant thereto, (iii) Credit Agreement Agent is entitled to establish reserves under the Credit Agreement relating to amounts owing to the Consultant in connection with sales of the Additional Goods (and/or set aside from collections received by Credit Agreement Agent, and not apply to the Obligations, amounts that may be owing to the Consultant under this Agreement in connection with the sales of any Additional Goods), and (iv) Merchant shall enter into such additional documentation as Credit Agreement Agent may reasonably request to evidence the agreements set forth in this clause (F).

(G)     Without limitation of Consultant's rights under Section 12.8 hereof, if Merchant fails to make payment to Consultant as required above of the proceeds of the sales of Additional Goods which results in the Consultant's demand on the Credit Agreement Agent under subsection (E) hereof, such failure shall entitle Consultant to suspend or terminate the sale of Additional Goods under this Agreement and exercise all rights and remedies of a secured party under the UCC with respect to the Additional Goods.

12.11   Confidentiality. All information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Merchant, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Merchant") is Merchant's confidential, trade secret information ("Merchant Confidential Information"), which is and shall remain the exclusive intellectual property of Merchant. Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents. Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Merchant Confidential Information. Consultant agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information only as reasonably necessary to the performance of its obligations related to the Sale. Notwithstanding the foregoing, Merchant hereby agrees that Consultant may identify Merchant as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

12.12   Force Majeure. If any casualty or act of God, war, or terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Closing Location(s), then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant and shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to Merchandise or proceeds

20

from business interruption insurance shall constitute proceeds of the Sale hereunder for purposes of calculating Gross Sales and the Success Fee (if any).

12.13  Waiver.  Merchant hereby acknowledges that it understands that: (i) Consultant's affiliate, GB Asset Advisors, LLC, provides appraisal services to Credit Agreement Agent, (including, without limitation with respect to the Merchandise) as well as to General Electric Capital Corporation in other unrelated transactions; and (ii) Consultant's affiliate, DJM Asset Management, LLC, provides real estate related services to Merchant.  Merchant and Credit Agreement Agent hereby waive any conflict or objection that they now have, or might in the future have, as a consequence of the multiple roles being played by Consultant and its affiliates. In exchange for such waiver Consultant and Merchant agree that Credit Agreement Agent may consult directly with the Consultant with respect to, and upon request shall provide Credit Agreement Agent with updates of, the services and transactions contemplated by this Agreement, the progress and results of the sales contemplated hereby and such other matters related thereto as Credit Agreement Agent may reasonably request (all without any additional compensation) and Consultant agrees to so consult with Credit Agreement Agent and provide such updates.  The Credit Agreement Agent shall not object to Merchant's participation in any such consultation with the Consultant.

12.14.  Bankruptcy Approval/Assumption.  In the event that Merchant becomes subject to the jurisdiction of any United States Bankruptcy Court, Merchant shall, as part of its first day orders or as soon as practicable thereafter (but in no event later than five business days) file a motion seeking to obtain an order from the United States Bankruptcy Court exercising jurisdiction over Merchant approving this Agreement on the terms set forth herein ("Approval Order").  The Approval Order shall contain provisions reasonably acceptable to Consultant.

12.15  Sample Inventory Taking.  Within seven (7) days after the Sale Commencement Date, Merchant and Consultant shall jointly conduct  a physical inventory (using Merchant's employees) at the following Closing Locations: (i) Congress – Coastland - Store 005; (ii) Carlyle – Charlotte Northlake - Store 250; and (iii) BB&B  - Dallas Galleria - Store 12152, and the costs shall be considered a Sale Expense; provided , that Consultant shall not be responsible for "shrink" at any Stores on the basis of such inventory taking.

[SIGNATURES APPEAR NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**GORDON BROTHERS RETAIL PARTNERS, LLC**
As Consultant

By: _Michael Charton_
Name: _Michael Charton_
Its: _Principal + Managing Director_

**FINLAY FINE JEWELRY CORPORATION**
As Merchant

By:_____
Name:
Its:

**GENERAL ELECTRIC CAPITAL CORPORATION**
As Credit Agreement Agent
*Solely with respect to Sections 12.8, 12.10 and 12.13*

By:_____
Name:
Its:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

GORDON BROTHERS RETAIL PARTNERS, LLC
As Consultant

By:_____
    Name:
    Its:

FINLAY FINE JEWELRY CORPORATION
As Merchant

By:_____
    Name: JOSEPH M. MELVIN
    Its: PRESIDENT & COO

GENERAL ELECTRIC CAPITAL CORPORATION
As Credit Agreement Agent
*Solely with respect to Sections 12.8, 12.10 and 12.13*

By:_____
    Name:
    Its:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**GORDON BROTHERS RETAIL PARTNERS, LLC**
As Consultant

By:_____
     Name:
     Its:

**FINLAY FINE JEWELRY CORPORATION**
As Merchant

By:_____
     Name:
     Its:

**GENERAL ELECTRIC CAPITAL CORPORATION**
As Credit Agreement Agent
*Solely with respect to Sections 12.8, 12.10 and 12.13*

By: _____
     Name: *Charles Chiado*
     Its: *Duly Authorized Signatory*

# Finlay Fine Jewelry Corporation
## Store List
## Exhibit A

| Concept | Store No. | Store | Address | City | State | Zip Code | Total Square Ft |
|---|---|---|---|---|---|---|---|
| BBB | 1250 | Annapolis Mall | 1250 Annapolis Mall | Annapolis | MD | 21401 | 2,657 |
| BBB | 1289 | Edison Mall | 151 Edison Mall | Fort Myers | FL | 33901 | 2,978 |
| BBB | 12106 | South Coast Plaza | 3333 Bristol Street | Costa Mesa | CA | 92626 | 3,792 |
| BBB | 12127 | One Mellon Bank | 500 Grant Street | Pittsburgh | PA | 15219 | 3,843 |
| BBB | 12139 | Willow Grove Park | 1096 Willow Grove Park Mall | Willow Grove | PA | 19090 | 3,052 |
| BBB | 12152 | Galleria Dallas | 13350 Dallas Parkway Ste. 1460 | Dallas | TX | 75240 | 3,090 |
| BBB | 12179 | Riverchase Galleria | 272 Riverchase Galleria | Birmingham | AL | 35244 | 3,852 |
| BBB | 12188 | Ross Park Mall | 1000 Ross Park Mall Dr.#E4 | Pittsburgh | PA | 15237 | 4,014 |
| BBB | 12200 | Stonestown Galleria | 3251 20Th Avenue, Box 115 | San Francisco | CA | 94132 | 2,000 |
| BBB | 12201 | Oak Court Mall | 4465 Poplar Ave | Memphis | TN | 38117 | 3,768 |
| BBB | 12229 | Cherry Hill Mall | 665 Cherry Hill Mall | Cherry Hill | NJ | 08002 | 3,634 |
| BBB | 12238 | Christiana Mall | 449 Christiana Mall Road | Newark | DE | 19702 | 2,862 |
| BBB | 12239 | Bellevue Square | 213 Bellevue Square | Bellevue | WA | 98004 | 2,928 |
| BBB | 12245 | Somerset Collection | 2800 Big Beaver Rd. | Troy | MI | 48084 | 5,670 |
| BBB | 12247 | Wolfchase Galleria | 2760 N. Germantown Pkwy, Suite 155 | Memphis | TN | 38133 | 1,998 |
| BBB | 12252 | Florida Mall | 8001 S. Orange Blossom Trail | Orlando | FL | 32809 | 3,176 |
| BBB | 12256 | The Westchester | 125 Westchester Ave | White Plains | NY | 10601 | 2,861 |
| BBB | 12257 | Westfarms Mall | 500 South Road | Farmington | CT | 06032 | 1,630 |
| BBB | 12262 | Stonefridge Mall | 2105 Stoneridge Blvd. | Pleasanton | CA | 94588 | 3,467 |
| BBB | 12265 | Meadowwood Mall | 5425 Meadowood Mall Cir. | Reno | NV | 89502 | 3,422 |
| BBB | 12266 | Mall of Louisiana | 1034 Mall Of Louisiana | Baton Rouge | LA | 70809 | 3,438 |
| BBB | 12272 | Scottsdale Fashion Square | 7014 E. Camelback Road | Scottsdale | AZ | 85251 | 850 |
| BBB | 12273 | Old Orchard Shopping Center | C31 Old Orchard Shopping Cr. Mall | Skokie | IL | 60077 | 2,945 |
| BBB | 12282 | Deer Park Town Center | 20530 N. Rand Rd. Suite 422 | Deer Park | IL | 60010 | 3,467 |
| BBB | 12291 | Mall of Georgia | 3333 Buford Dr Suite 2048 | Buford | GA | 30519 | 3,765 |
| BBB | 12326 | Biltmore Fashion Park | 2538 East Camelback Rd. | Phoenix | AZ | 85016 | 4,230 |
| BBB | 12357 | Menlo Park Mall | 347 Menlo Park, Suite 1530 | Edison | NJ | 08837 | 4,233 |
| BBB | 12360 | Shops at La Cantera | 15900 La Cantera Pkwy | San Antonio | TX | 78216 | 4,187 |
| BBB | 12424 | Partridge Creek | 17420 Hall Rd | Clinton Township | MI | 48038 | 3,800 |
| BBB | 12506 | Orland Square | 314 Orland Square Mall | Oralnd Park | IL | 60462 | 3,610 |
| BBB | 12694 | Perimeter Mall | 4400 Ashford Dunwoody Rd. N.E. | Atlanta | GA | 30346 | 4,225 |
| BBB | 12697 | Lenox Square Mall | 3393 Peachtree Rd. N.E.,Suite 219 | Atlanta | GA | 30326 | 4,050 |
| BBB | 12770 | Morrison (Downtown) | 9595 Sw Washington Sq. Rd | Portland | OR | 97223 | 4,398 |
| BBB | 12858 | Cherry Creek Mall | 3000 E. 1St. Ave. Suite 140 | Denver | CO | 80206 | 6,000 |
| Congress | 4 | Naples | 601 5th Avenue S. | Naples | FL | 34102 | 4,683 |
| Congress | 5 | Coastland Center | 1708 9th Street N #A17 | Naples | FL | 34102 | 3,155 |
| Congress | 1 | Sanibel | 2075 Periwinkle Way #35 | Sanibel | FL | 33957 | 3,919 |
| Congress | 2 | Bonita | 25555 S. Tamiami Trail | Bonita Springs | FL | 34134 | 3,919 |
| Carlyle | 65 | Tallahassee Mall | 551 Tallahassee Mall | Tallahassee | FL | 32303 | 1,684 |
| Carlyle | 190 | River Ridge Mall | 3405 Candlers Mountain Road | Lynchburg | VA | 24502 | 2,131 |
| Carlyle | 199 | Huntington Mall | 470 Huntington Mall | Barboursville | WV | 25504 | 1,667 |
| Carlyle | 207 | Citadel Mall | 2070 Sam Rittenberg Boulevard | Charleston | SC | 29407 | 1,452 |
| Carlyle | 235 | Carolina Place Mall | 11025 Carolina Place Parkway | Pineville | NC | 28134 | 1,430 |
| Carlyle | 247 | The Gardens (A) | 3101 PGA Boulevard | Palm Beach Gardens | FL | 33410 | 3,628 |
| Carlyle | 250 | Northlake Mall | 6801 Northlake Mall Drive | Charlotte | NC | 28216 | 2,200 |
| Carlyle | 252 | Myrtle Beach | 3320 Reed Street | Myrtle Beach | SC | 29577 | *3,234* |
| Carlyle | 254 | Indian Lake | 300 Indian Lake Boulevard | Hendersonville | TN | 37075 | 2,593 |
| Carlyle | 256 | Pier Park | 15601 Starfish Street | Panama City Beach | FL | 32413 | 3,363 |
| Carlyle | 312 | Suburban Square | 25 Coulter Avenue | Ardmore | PA | 19003 | 2,211 |
| Carlyle | 314 | Valley Square | 1528 Main Street | Warrington | PA | 18976 | 2,548 |

**50**     **Total Stores**                                                                                   **3,234**

# Exhibit B - Removed Goods

Due to the voluminous nature of these Exhibits we are not attaching the actual SKU listing. However, below is a summary reference to the files that comprise the "Removed Goods" for all 3 Brands (except that in Congress, all Rolex was removed and there is no specific file pertaining to same).

| BRAND | FILE NAME | ESTIMATED COST VALUE | DATE PROVIDED TO CONSULANT | |
|---|---|---|---|---|
| BBB | #02AD - BBB Transfer In and Out by SKU | $3,079,398 | 3/11/2009 | Nineteenth Supplemental Email |
| CARLYLE | Carlyle Transfers Out of 12 Closing Stores by Department by Vendor | $5,749,446 | 3/17/2009 | Twenty Fourth Supplemental Email |
| | ALL ROLEX GOODS WERE REMOVED FROM THE STORES - NO FILES | $3,634,618 | | |
| CONGRESS* | AVAILABLE | | N/A | N/A |

[1] The Congress On Hand Files included all five stores in Congress and Bidders were instructed to exclude the Key West Store

[2] Memo goods transferred out would be in addition to the figures shown.

Amounts Paid Directly to Landlord - Projected Totals March through August 2009

# of Days in Period: 184

| Store Number | Store Name | State | Rent | CAM | Misc Rent | Utilities | Telephone | Alarm System | Security Guard | Secured Courier | Misc Security | Insurance | Asset Repair | Maintenance | Business Tax | Total Projected Occupancy Expenses March - August 2009 | Per Diem Occupancy Expenses [3] | Percentage Rent [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 681 Tallahassee Mall | | 32,528.00 | 13,801.00 | 4,061.00 | 7,707.00 | 4,681.00 | 792.00 | - | - | 330.00 | 2,786.00 | 473.00 | 1,560.00 | 27.00 | 68,904.00 | 374.48 | See Footnote |
| 7 | 196 Eastland Mall | | 64,104.00 | 19,359.00 | 1,898.00 | 7,660.00 | 7,745.00 | 598.00 | - | - | 340.00 | 2,786.00 | 644.00 | 1,560.00 | 4,850.00 | 107,484.00 | 584.15 | See Footnote |
| 8 | 198 Huntington Mall | | 99,578.00 | 10,030.00 | 1,568.00 | 2,834.00 | 5,267.00 | 508.00 | - | - | 220.00 | 2,786.00 | 1,032.00 | 1,560.00 | 21,368.00 | 105,757.00 | 574.77 | See Footnote |
| 9 | 207 Chapel Mall | | 48,784.00 | 10,176.00 | 2,902.00 | 8,651.00 | 5,798.00 | 698.00 | - | 1,000.00 | 260.00 | 2,786.00 | 1,216.00 | 1,560.00 | | 80,551.00 | 437.78 | See Footnote |
| 14 | 236 Cambria Plaza Mall | | 65,070.00 | 16,686.00 | 2,962.00 | 6,361.00 | 3,068.00 | 606.00 | - | 200.00 | 220.00 | 2,786.00 | 102.00 | 1,560.00 | 1,085.00 | 119,906.00 | 651.97 | See Footnote |
| 21 | 237 The Gardens | | 135,574.00 | 54,140.00 | 24,313.00 | 6,625.00 | 3,541.00 | 564.00 | - | - | 220.00 | 2,786.00 | 2,643.00 | 1,560.00 | 46.00 | 258,831.00 | 1,406.69 | See Footnote |
| 23 | 250 Northlake Mall | | 48,000.00 | 31,212.00 | 8,299.00 | 13,106.00 | 3,397.00 | 564.00 | - | - | 280.00 | 2,786.00 | 2,017.00 | 1,560.00 | 971.00 | 124,192.00 | 674.96 | See Footnote |
| 24 | 252 The Market Common (Myrtle Beach) | | 56,016.00 | 7,637.00 | 2,762.00 | 3,900.00 | 4,043.00 | 420.00 | - | - | 300.00 | 2,786.00 | 200.00 | 1,560.00 | 5,050.00 | 84,674.00 | 460.18 | See Footnote |
| 25 | 254 Harbison Lake | | 57,808.00 | 7,284.00 | 3,630.00 | 4,539.00 | 3,759.00 | 420.00 | - | - | 220.00 | 2,786.00 | 816.00 | 1,560.00 | 956.00 | 77,822.00 | 422.95 | See Footnote |
| 27 | 256 Pier Park | | 54,156.00 | 14,368.00 | 4,420.00 | 5,634.00 | 7,800.00 | 714.00 | - | - | 300.00 | 2,786.00 | 196.00 | 1,560.00 | 3,710.00 | 95,614.00 | 519.64 | See Footnote |
| 32 | 312 Lynnhaven Square | | 46,782.00 | 14,175.00 | 2,286.00 | 8,673.00 | 3,983.00 | 420.00 | 23,400.00 | 250.00 | 250.00 | 2,786.00 | 556.00 | 1,560.00 | 1,095.00 | 87,841.00 | 477.40 | See Footnote |
| 33 | 314 Valley Square | | 50,778.00 | 9,586.00 | 3,946.00 | 7,446.00 | 4,337.00 | 420.00 | - | 600.00 | 380.00 | 2,786.00 | 716.00 | 1,560.00 | | 106,139.00 | 576.84 | See Footnote |
| Totals | | | 715,776.00 | 208,455.00 | 66,617.00 | 82,742.00 | 51,644.00 | 6,984.00 | 76,340.00 | 2,250.00 | 3,300.00 | 33,432.00 | 10,833.00 | 18,726.00 | 39,197.00 | 1,317,717.00 | 7,161.51 | |
| Per Diem Totals | | | 3,890.09 | 1,132.88 | 372.38 | 449.68 | 280.25 | 35.84 | 414.89 | 12.23 | 17.93 | 181.70 | 58.88 | 101.74 | 213.03 | | 7,161.51 | |

In addition to the Per Diem Occupancy Expense detailed on this spreadsheet, the Liquidator is responsible for all Percentage Rent that may be incurred as a result of the sale. Bidders should refer to File "REIT - Closing Store Lease/Summaries - All Divi"

**Amounts Paid Directly to Landlord - Projected Totals March through August 2000**

| Store Number | Store Name | Base Rent | Storage Rent | CAM | Exterior CAM | HVAC | Insurance | Media Fund | Merchant Association | Promo Fund | Real Estate Taxes | State Taxes | Water | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12050 Annapolis Mall | 186,660.04 | - | 16,436.00 | 150.00 | - | - | - | - | 3,988.70 | 7,276.58 | - | 180.00 | - |
| 2 | 12100 Edison Mall | 46,456.00 | - | 25,715.04 | 1,333.30 | - | - | 1,586.34 | - | 1,595.22 | 10,001.72 | 7,276.62 | - | - |
| 3 | 12190 South Coast Plaza | 151,680.00 | - | 46,995.18 | - | 17,355.84 | - | - | - | 11,129.52 | - | - | - | - |
| 4 | 12177 One Pacific Place | 78,660.00 | - | 574.26 | 465.00 | - | - | - | - | - | 2,400.12 | - | - | - |
| 5 | 12193 Willow Grove Park | 109,872.00 | - | 23,973.48 | 152.58 | - | - | - | - | 6,409.20 | 7,979.28 | - | - | 6,287.10 |
| 6 | 12152 Galleria Dallas | 154,500.00 | - | 30,550.10 | - | 8,625.00 | - | - | - | 5,365.56 | 22,618.80 | - | - | - |
| 7 | 12178 Riverchase Galleria | 107,550.00 | - | 25,787.04 | - | 9,216.00 | 769.60 | - | - | 1,206.50 | 4,477.26 | - | - | - |
| 8 | 12188 Ross Park Mall | 115,000.02 | - | 28,358.64 | 1,459.62 | 7,446.00 | 1,456.68 | 4,851.26 | - | 4,911.90 | 11,118.78 | - | 271.56 | 7,992.00 |
| 9 | 12206 Northpark Galleria | 133,968.69 | - | 42,411.18 | - | 600.00 | - | - | - | - | - | - | 150.00 | - |
| 10 | 12201 Oak Court Mall | 79,999.98 | 1,500.00 | 35,161.44 | 2,883.14 | - | 880.38 | 3,530.62 | - | 3,375.24 | 15,980.68 | - | 429.40 | 8,355.48 |
| 11 | 12229 Cherry Hill Mall | 134,619.95 | - | 16,065.36 | 272.58 | 5,160.42 | - | - | 5,880.08 | 5,233.78 | 21,750.84 | - | 372.06 | 7,992.00 |
| 12 | 12233 Christiana Mall | 154,514.00 | - | 18,843.06 | - | - | - | - | - | 3,680.04 | 2,446.98 | - | - | - |
| 13 | 12234 Bellevue Square | 153,720.00 | - | 22,588.84 | - | - | - | - | - | - | 1,815.36 | - | - | - |
| 14 | 12245 Somerset Collection | 246,933.33 | - | 67,555.50 | - | 11,680.20 | - | - | - | - | 24,154.20 | - | - | - |
| 15 | 12247 Wolfchase Galleria | 100,000.00 | - | 18,444.48 | 831.06 | - | - | 2,431.14 | - | 2,431.14 | 13,516.50 | - | - | 180.00 |
| 16 | 12258 Florida Mall | 182,499.98 | - | 32,081.72 | 659.46 | - | - | 3,369.60 | - | 3,467.66 | 7,177.74 | 13,623.72 | - | - |
| 17 | 12255 The Westchester | 207,422.50 | - | 47,739.60 | 1,535.16 | 6,312.66 | - | 2,365.68 | - | 2,365.68 | 23,045.34 | - | 118.68 | - |
| 18 | 12257 Westfarms Mall | 114,150.02 | - | 19,168.52 | - | 6,188.84 | 915.30 | - | - | 3,017.22 | 5,455.68 | - | - | 1,943.34 |
| 19 | 12265 Stoneridge Mall | 193,333.33 | - | 34,323.06 | 1,102.56 | 6,213.48 | - | - | - | 6,118.56 | 6,801.96 | - | - | - |
| 20 | 12266 Meadowood Mall | 175,000.00 | - | 30,214.92 | 1,396.08 | - | - | - | - | 5,229.48 | 1,077.96 | - | - | 10,470.00 |
| 21 | 12272 Mall Of Louisiana | 137,500.00 | - | 45,034.92 | - | 9,999.00 | - | - | - | - | 1,804.86 | - | - | - |
| 22 | 12222 Scottsdale Fashion Square | 40,375.00 | 753.72 | 12,524.76 | - | - | - | - | - | 2,409.00 | 3,120.00 | 3,761.04 | - | - |
| 23 | 12223 Old Orchard Shopping Center | 92,031.24 | - | 25,044.24 | 180.00 | 6,324.00 | - | - | - | 2,869.42 | 39,271.44 | - | 150.00 | - |
| 24 | 12240 Fashion Show | 97,666.68 | - | 41,459.66 | - | - | - | - | 5,021.64 | - | 716.30 | - | 268.80 | - |
| 25 | 12244 Mall Of Georgia | 50,000.00 | - | 29,269.26 | 1,532.40 | 6,871.14 | - | 2,823.78 | - | 3,044.76 | 8,038.26 | - | 226.86 | 4,928.72 |
| 26 | 12268 Biltmore Fashion Park | 170,000.00 | - | 61,548.96 | - | - | - | - | - | 7,769.88 | 4,250.34 | 6,315.88 | - | - |
| 27 | 12271 Menlo Park Mall | 180,854.00 | - | 36,636.90 | 3,672.30 | 7,254.58 | 659.28 | 3,938.76 | - | 3,777.18 | 15,513.36 | - | 301.74 | - |
| 28 | 12260 The Shops At La Cantera | 131,800.00 | - | 28,927.48 | - | - | - | - | - | - | 20,119.54 | - | 240.00 | - |
| 29 | 12243 Fashion Valley | 40,000.00 | - | - | - | 19,097.50 | 1,031.46 | - | - | 5,250.00 | 11,060.96 | - | - | - |
| 30 | 12262 Oxford Square | 79,997.64 | - | 20,062.14 | 1,677.84 | 13,596.42 | 1,118.04 | 2,184.62 | - | 2,145.78 | 33,968.14 | - | - | 4,233.24 |
| 31 | 12202 Perimeter Mall | 78,674.00 | - | 71,061.60 | - | 2,491.44 | 21.00 | - | - | - | - | - | 61.20 | 6,358.68 |
| 32 | 12697 Lenox Square Mall | 293,867.50 | - | 41,674.50 | 1,920.84 | 5,913.06 | 771.48 | 4,223.16 | - | 5,957.42 | 15,066.00 | - | 347.10 | - |
| 33 | 12770 Montien (Downtown Temp Spac | 554,976.00 | 2,405.40 | - | - | 2,296.92 | - | - | - | 3,758.70 | 14,378.22 | - | 180.00 | - |
| 34 | 12249 Cherry Creek Mall | 300,000.00 | - | 716,531.68 | - | - | - | - | - | - | - | - | - | - |
| | **Totals** | 4,851,966.67 | 4,659.12 | 1,045,700.36 | 40,506.42 | 139,383.00 | 7,632.22 | 31,265.16 | 10,911.72 | 107,724.90 | 366,283.44 | 30,378.06 | 3,297.40 | 59,741.74 |
| | **Per Diem Totals** | 24,358.63 | 25.32 | 5,683.15 | 220.14 | 757.52 | 41.48 | 169.92 | 59.30 | 585.46 | 1,990.67 | 165.10 | 17.92 | 319.25 |

In addition to the Per Diem Occupancy Expense detailed on this spreadsheet, the Liquidator is responsible for all Percentage Rent that may be incurred as a result of the sale. Bidders should refer to File "WTF - Closing Store Lease Summaries - All Divi"

The Company anticipates that it will vacate Store #12179 - Riverchase Galleria when its lease expires at the end of April

Final AB Exhibits.xls

**Amounts Paid Other than to Landlord - Projected Totals March through August 2009**

| Store Number | Store Name | Utilities | Telephone | Alarm | Security | Repairs and Maintenance | Business Taxes | Equipment Rental | Insurance | Total Projected Occupancy Expenses March - August 2009 | Per Diem Occupancy Expenses | Percentage Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12050 Annapolis Mall | 1,260.00 | 2,040.00 | 1,440.00 | - | 12,760.00 | 1,060.00 | - | 5,509.09 | 260,333.59 | 1,320.73 | See Footnote |
| 2 | 12060 Akron Mall | 7,980.00 | 2,760.00 | 2,760.00 | - | 11,700.00 | 3,060.00 | - | 5,163.64 | 160,513.99 | 872.36 | See Footnote |
| 3 | 12106 South Coast Plaza | 31,860.00 | 4,320.00 | 4,800.00 | - | 4,320.00 | - | 60.00 | 6,927.27 | 279,447.81 | 1,518.74 | See Footnote |
| 4 | 12137 Chesterfield | 6,420.00 | 1,020.00 | 3,780.00 | - | 1,320.00 | 3,300.00 | - | 7,236.36 | 99,350.74 | 539.46 | See Footnote |
| 5 | 12139 Willow Grove Park | 3,612.90 | 1,080.00 | 780.00 | - | 1,560.00 | 4,680.00 | 60.00 | 5,563.64 | 174,530.18 | 948.53 | See Footnote |
| 6 | 12152 Galleria Dallas | 18,900.00 | 2,640.00 | 16,860.00 | 44,340.00 | 2,940.00 | 4,360.00 | 60.00 | 8,454.55 | 382,644.01 | 2,079.59 | See Footnote |
| 7 | 12178 Riverchase Galleria | 11,100.00 | 2,700.00 | 2,100.00 | - | 4,380.00 | 4,360.00 | - | 4,145.45 | 176,681.35 | 960.23 | See Footnote |
| 8 | 12188 Ross Park Mall | 10,908.00 | 1,800.00 | 3,480.00 | - | 1,560.00 | 2,220.00 | - | 4,363.64 | 207,178.40 | 1,125.97 | See Footnote |
| 9 | 12200 Houston Galleria | 9,360.00 | 4,080.00 | 3,720.00 | - | 9,900.00 | 7,020.00 | - | 5,236.36 | 215,936.44 | 1,173.57 | See Footnote |
| 10 | 12201 Oak Court Mall | 11,520.00 | 3,480.00 | 3,300.00 | - | 2,340.00 | 3,540.00 | - | 2,072.73 | 168,163.41 | 913.48 | See Footnote |
| 11 | 12229 Cherry Hill Mall | 10,364.52 | 2,040.00 | 2,040.00 | - | 2,280.00 | 1,120.00 | - | 3,781.82 | 219,234.20 | 1,191.49 | See Footnote |
| 12 | 12236 Chandlera Mall | 7,698.00 | 3,120.00 | 3,180.00 | - | 1,140.00 | 9,480.00 | - | 4,909.09 | 190,156.03 | 1,033.67 | See Footnote |
| 13 | 12239 Bellevue Square | 7,020.00 | 3,840.00 | 3,840.00 | (1,140.00) | 4,020.00 | 12,840.00 | - | 6,672.73 | 224,216.73 | 1,218.57 | See Footnote |
| 14 | 12245 Somerset Collection | 22,920.00 | 2,340.00 | 3,660.00 | - | 6,600.00 | 2,820.00 | 120.00 | 6,454.55 | 383,576.23 | 2,085.31 | See Footnote |
| 15 | 12247 Walthchase Galleria | 5,340.00 | 2,460.00 | 3,060.00 | - | 840.00 | 4,200.00 | - | 2,400.00 | 155,834.52 | 846.93 | See Footnote |
| 16 | 12253 Florida Mall | 8,940.00 | 3,660.00 | 4,380.00 | - | 3,900.00 | 6,120.00 | 60.00 | 6,054.55 | 256,140.43 | 1,392.07 | See Footnote |
| 17 | 12256 The Westchester | 18,900.00 | 4,500.00 | 2,580.00 | - | 2,280.00 | 720.00 | 60.00 | 4,854.55 | 324,766.95 | 1,765.22 | See Footnote |
| 18 | 12257 Westfarms Mall | 7,776.66 | 2,280.00 | 960.00 | 60.00 | 2,040.00 | 600.00 | - | 3,490.91 | 169,255.48 | 919.87 | See Footnote |
| 19 | 12260 Stoneridge Mall | 21,420.00 | 4,140.00 | 3,900.00 | - | 3,060.00 | 1,260.00 | 60.00 | 7,036.36 | 297,710.08 | 1,618.21 | See Footnote |
| 20 | 12265 Meadowood Mall | 1,296.00 | 2,460.00 | 2,220.00 | - | 5,100.00 | 3,540.00 | - | 5,072.73 | 243,311.17 | 1,320.71 | See Footnote |
| 21 | 12269 Westfield of Louisiana | 12,540.00 | 2,820.00 | 720.00 | 240.00 | 3,000.00 | 26,640.00 | - | 4,636.36 | 221,355.54 | 1,203.02 | See Footnote |
| 22 | 12272 Scottsdale Fashion Square | 9,840.00 | 3,120.00 | 1,020.00 | - | 2,880.00 | 300.00 | 60.00 | 5,636.36 | 85,099.90 | 462.50 | See Footnote |
| 23 | 12273 Old Orchard Shopping Center | 12,240.00 | 1,620.00 | 4,560.00 | 180.00 | 7,440.00 | 240.00 | - | 3,727.73 | 195,003.07 | 1,059.80 | See Footnote |
| 24 | 12276 Deer Park Town Center | 11,580.00 | 1,620.00 | 4,440.00 | - | 5,820.00 | 240.00 | - | 4,527.27 | 154,625.55 | 840.36 | See Footnote |
| 25 | 12291 Mall Of Georgia | 9,110.28 | 1,620.00 | 3,060.00 | - | 2,220.00 | 14,820.00 | - | 2,836.36 | 138,593.62 | 753.23 | See Footnote |
| 26 | 12329 Willowbrook Temp Space | 10,680.00 | 3,480.00 | 5,280.00 | - | 3,600.00 | 1,080.00 | - | 2,559.09 | 285,763.65 | 1,553.20 | See Footnote |
| 27 | 12357 Menlo Park Mall | 17,520.00 | 6,420.00 | 4,140.00 | 46,980.00 | 2,940.00 | 180.00 | - | 3,922.27 | 267,740.67 | 1,455.11 | See Footnote |
| 28 | 12360 The Shops At La Cantera | 9,720.00 | 2,100.00 | 11,520.00 | - | 14,520.00 | 87,660.00 | 120.00 | 5,236.36 | 339,252.99 | 1,843.77 | See Footnote |
| 29 | 12524 Cambridge Oaks | 7,068.00 | 780.00 | - | - | 420.00 | - | - | 54.55 | 107,149.87 | 582.33 | See Footnote |
| 30 | 12590 Orland Square | 22,188.78 | 780.00 | 1,080.00 | - | 3,660.00 | - | - | 3,654.55 | 191,165.17 | 1,038.94 | See Footnote |
| 31 | 12591 Perimeter Mall | 4,501.14 | 5,880.00 | 5,340.00 | - | 6,480.00 | 22,380.00 | - | 4,763.40 | 248,336.07 | 1,349.54 | See Footnote |
| 32 | 12697 Lenox Square Mall | 17,580.00 | 5,340.00 | 16,860.00 | 39,300.00 | 9,420.00 | 38,880.00 | 60.00 | 6,872.73 | 445,813.77 | 2,423.23 | See Footnote |
| 33 | 12700 Morrison (Downtown) Temp Space | 11,460.00 | 9,300.00 | 5,400.00 | 660.00 | 2,040.00 | 1,220.00 | - | 8,681.82 | 90,121.32 | 489.79 | See Footnote |
| 34 | 12898 Cherry Creek Mall | 27,840.00 | 6,300.00 | 1,380.00 | - | 6,060.00 | 2,680.00 | - | 8,236.36 | 449,991.88 | 2,445.61 | See Footnote |
| | **Totals** | 396,416.26 | 110,040.00 | 127,980.00 | 130,520.00 | 152,280.00 | 315,900.00 | 780.00 | 161,072.73 | 7,723,563.10 | 41,975.89 | |
| | **Per Diem Totals** | 2,154.45 | 598.04 | 695.54 | 709.89 | 827.41 | 1,716.85 | 4.24 | 875.40 | | 41,975.89 | |

In addition to the Per Diem Occupancy Expenses detailed on this spreadsheet, the Liquidator is responsible for all Percentage Rent that may be incurred as a result of the sale. Bidders should refer to File "#17 - Closing Store Lease Summaries - AB Divi"

The Company anticipates that it will vacate Store #12179 - Riverchase Galleria when its lease expires at the end of April

Final All Exhibits.xls

## Amounts Paid Directly to Landlord - Projected Totals March through August 2006

| Store Number | Store Name | State | Base Rent | Storage Rent | CAM | Exterior CAM | HVAC | Insurance | Media Fund | Merchant Association | Promo Fund | Real Estate Taxes | State Taxes | Water | Utilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | Sanibel | | 106,600.28 | - | - | - | - | 3,147.66 | - | - | - | 9,167.08 | 7,215.21 | 1,745.17 | 1,501.25 |
| 002 | Bonita | | 147,006.64 | - | 4,699.98 | - | - | 3,931.44 | - | - | - | 10,912.38 | 10,011.00 | - | - |
| 003 | Key West | | 156,240.00 | - | 15,129.42 | - | - | - | - | - | - | - | 11,718.00 | - | - |
| 004 | Naples | | 122,074.48 | - | 8,558.64 | - | - | 7,133.96 | - | - | - | - | 9,905.46 | - | - |
| 005 | Coastland Center | | 100,022.00 | - | 26,435.76 | - | - | - | - | - | - | 4,907.43 | 7,980.74 | 42.00 | - |
| | Totals for all Five Locations | | 631,916.58 | - | 55,123.80 | - | - | 14,213.06 | - | - | - | 23,986.89 | 46,687.41 | 1,787.17 | 1,501.25 |
| | Per Diem Totals for all Five Locations | | 3,434.33 | - | 299.59 | - | - | 77.24 | - | - | - | 130.36 | 249.39 | | 8.16 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals for Four Locations Excluding Key West | | | 475,676.58 | - | 39,994.38 | - | - | 14,213.06 | - | - | - | 23,986.89 | 34,169.41 | 1,787.17 | 1,501.25 |
| Per Diem Totals for Four Locations Excluding Key West | | | 2,585.20 | - | 217.36 | - | - | 77.24 | - | - | - | 130.36 | 185.70 | | 8.16 |

In addition to the Per Diem Occupancy Expense
detailed on this spreadsheet, the Liquidator is
responsible for all Percentage Rent that may be
incurred as a result of the sale. Bidders should refer
to File "#1F - Closing Store Lease Summaries - All Div

**Amounts Not Paid Directly to Landlord - Projected Totals March through August 2009**

# of Days in Period: 184

| Store Number | Store Name | State | Utilities | Telephone | Alarm | Security | Repair & Maintenance | Business Tax | Equipment Rental | Total Projected Occupancy Expenses March - August 2009 | Per Diem Occupancy Expenses [1] | Percentage Rent [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | Sanibel | | 7,286.98 | 5,395.14 | 864.57 | 2,790.00 | 2,394.18 | | | 148,160.50 | 794.35 | See Footnote |
| 002 | Bonita | | 17,451.56 | 5,364.29 | 3,605.36 | 20,520.00 | 6,566.57 | | | 230,123.42 | 1,250.67 | See Footnote |
| 003 | Key West | | 7,042.55 | 3,361.88 | 1,125.59 | - | 2,842.96 | | | 197,490.40 | 1,073.32 | See Footnote |
| 004 | Naples | | 8,316.14 | 3,433.21 | 954.00 | 9,130.00 | 3,543.24 | | | 173,110.11 | 940.82 | See Footnote |
| 006 | Coastland Center | | 10,025.55 | 3,118.62 | 614.08 | - | 1,419.82 | | | 154,661.00 | 840.55 | See Footnote |
| Totals for all Five Locations | | | # 50,122.78 | 20,614.14 | 7,163.60 | 32,440.00 | 16,766.75 | - | - | 901,545.43 | 4,899.70 | |
| Per Diem Totals for all Five Locations | | | | | | | | | | | 4,899.70 | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals for Four Locations (Excluding Key West) | | | # 43,080.23 | 17,222.26 | 6,038.01 | 32,440.00 | 13,945.79 | - | - | 704,055.03 | 3,826.39 | |
| Per Diem Totals for Four Locations Excluding Key West | | | | | | | | | | | 3,826.39 | |

[1] In addition to the Per Diem Occupancy Expense detailed on this spreadsheet, the Liquidator is responsible for all Percentage Rent that may be incurred as a result of the sale. Bidders should refer to File "#H" - Closing Store Lease Summaries - All Divi

## Exhibit D- TRANSFER GOODS

Due to the voluminous nature of these Exhibits we are not attaching the actual SKU listing. However, below is a summary reference to the files that comprise the "Tranfer Goods" for all 3 Brands

| BRAND | FILE NAME | ESTIMATED COST VALUE | DATE PROVIDED TO CONSULANT | SUPPLEMENT NAME |
|---|---|---|---|---|
| BBB | #02AD - BBB Transfer In and Out by SKU | $8,129,126 | 3/11/2009 | Nineteenth Supplemental Email |
| CARLYLE | Carlyle Transfers to 12 Closing Stores by Department by Vendor | $6,239,528 | 3/17/2009 | Twenty Fourth Supplemental Email |
| CONGRESS* | N/A | N/A | N/A | N/A |
| | | | | |
| | | | | |
| | | | | |

* There were no transfers into the Congress locations.

# Finlay Fine Jewelry Corporation
## Expense Budget
## Exhibit E

| | | |
|---|---|---|
| # of Stores | 50 | |
| Sale Term: | 03/21/09 | 09/20/09 |
| | Saturday | Sunday |
| # of days | 184 | |
| # of Weeks | 26.3 | |
| # of Store Weeks | 1,316.8 | |
| | | |
| Total Retail Inventory | 200,959,517 | |
| Total Cost Inventory | 90,897,923 | |
| IMU % | 54.8% | |
| CF % | 45.2% | |

**Operating Expenses:**

Payroll

| | |
|---|---|
| Payroll Stores | 6,718,192 |
| Commission | 1,694,396 |
| Incentive Bonus | 841,259 |
| Taxes & Benefits | 1,816,805 |
| **Subtotal Payroll** | **11,070,651** |

Advertising

| | |
|---|---|
| Media | 4,348,749 |
| Signs | 250,000 |
| **Subtotal Advertising** | **4,598,749** |

| | |
|---|---|
| All Occupancy as per Company Per Diem Schedules | 9,763,988 |
| **Occupancy** | **9,763,988** |

Miscellaneous

| | |
|---|---|
| Inventory Insurance | 95,610 |
| General Liability | 118,927 |
| Store Consolidation | 86,000 |
| Bank and Credit Card Fee's | 1,476,198 |
| Miscellaneous Expenses | 915,196 |
| Overhead | 174,992 |
| **Subtotal Miscellaneous** | **2,866,924** |

Supervision

| | |
|---|---|
| **Subtotal Supervision** | **2,516,558** |

| | |
|---|---|
| **Total Expenses** | **30,816,870** |

## AMENDMENT NO. 1 TO CONSULTING AGREEMENT

This Amendment No. 1 to Consulting Agreement (this "Amendment") is made as of this 20th day of May 2009, between Finlay Fine Jewelry Corporation, a Delaware corporation, (the "Merchant") and Gordon Brothers Retail Partners, LLC, a Delaware limited liability (the "Consultant"). Merchant and Consultant shall sometimes each be referred to herein as a "Party" or collectively as the "Parties".

WHEREAS, Merchant and Consultant entered into an Consulting Agreement (the "Consulting Agreement"), as of March 20, 2009, in connection with the liquidation of Merchant's owned Merchandise located at certain of Merchant's Stores, as identified on Exhibit A to the Consulting Agreement by means of a promotional, store closing or similar sale, as further described therein;

WHEREAS, Section 11 of the Consulting Agreement provides that during the first thirty (30) days of the Sale, Merchant shall have the option to include one or more Additional Stores in the Sale (the "Additional Store Option");

WHEREAS, on or about April 15, 2009 Merchant exercised the Additional Store Option and included eight (8) Additional Stores, as identified on Exhibit 1 annexed hereto (the "Eight Additional Stores");

WHEREAS, on or about May 6, 2009, Merchant advised Consultant that the landlord (the "North Park Landlord") for Store #12533 in North Park, TX (the "North Park Store") has advised Merchant that it was the North Park Landlord's opinion that the conduct of the Sale and the North Park Store in its present form is in violation of the lease for such location and that unless such conduct was terminated prior to May 15, 2009, the North Park Landlord would pursue its remedies against Merchant (and certain other parties obligated under the lease);

WHEREAS, in connection with the including of the Eight Additional Stores and the issues raised by the North Park Landlord, Merchant and Consultant desire to, and hereby amend and modify the Consulting Agreement as set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Consultant and Merchant agree as follows:

Section 1.      Incorporation of Terms. All capitalized terms shall have the same meanings as ascribed thereto in the Consulting Agreement or the Security Agreement, as the case may be, unless the same shall be expressly amended and modified by the terms of this Amendment.

Section 2.      Inclusion of Eight Additional Stores.

    (a)      The Consulting Agreement shall be amended as follows:

     (i)  The Sale Commencement Date for the Eight Additional Stores shall be April 24, 2009; except that the Sale Commencement Date for "Congress Store No. 3" shall be April 30, 2009.

     (ii)  The definition of "Stores" in the Recitals of the Consulting Agreement shall be amended to include the Eight Additional Stores.

     (iii)  The definition of "Sale Termination Date" in Section 1 of the Consulting Agreement shall be amended and restated to provide in its entirety as follows: "Sale Termination Date" for the Eight Additional Stores shall mean October 31, 2009, or with respect to any one or more Stores such earlier date(s) as determined by Consultant upon seven (7) days notice to Merchant"; provided however, Merchant and Consultant reserve the right to mutually agree to extend the Sale Termination Date at any one or more of the Stores (including the Eight Additional Stores), with any impact of the Budget to be agreed upon by Consultant and Merchant (in consultation with the Lender) and Consultant.

     (iv)  The Budget attached as Exhibit E to the Consulting Agreement shall be removed and replaced with the Amended Budget annexed hereto as Exhibit "2" .

     (v)  The definition of "Merchandise" in the Consulting Agreement shall be amended to include the Merchandise in the Eight Additional Stores.

     (vi)  The Owned FF&E in the Eight Additional Stores shall be subject to Section 3.3 of the Consulting Agreement and Merchant and Consultant shall mutually agree upon an appropriate FF&E Budget for the Eight Additional Stores.

Section 3. Conduct of the Sale at the North Park Store

     (a)  Merchant and Consultant have agreed, with respect to the North Park Store only, that the Sale shall be conducted in accordance with the following parameters agreed to by the Merchant with the North Park Landlord:

     (i)  The North Park Store shall be excluded from all media advertisements to the extent such media advertisements also advertise or refer to the Sale at other Stores in the same media market as the North Park Store.

     (ii)  None of the signage in the North Park Store shall include the word "every", "store closing", "liquidation"; and

     (iii)  Merchant and Agent shall at all times during the sale maintain Merchandise in the North Park Store that is not subject to any promotional discounting.

     (b)  The agreements set forth in Section 3(a) shall apply only during such time as the Sale is not subject to an approval order approving/assuming the Sale entered by a United States Bankruptcy Court.

Section 4. Miscellaneous

(a)     Entire Agreement.  This Amendment, along with the Consulting Agreement (including without limitation the Consignment Agreement dated April 6, 2009 contemplated by the Consulting Agreement), contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby.  Except as expressly amended or modified by the provisions of the Amendment, the Consulting Agreement and the Consignment Agreement shall each remain in full force and effect between the Parties.

(b)     Merchant hereby represents to Consultant that all of the Eight Additional Stores are owned/operated only by one or more of the Finlay entities/subs who are "Consignees" under the Consignment Agreement.

(c)     Governing Law; Consent to Jurisdiction.  This Amendment shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions which would result in the application of the laws of another jurisdiction.

(d)     Amendments.  This Amendment may not be modified except in a written instrument executed by each of the Parties, with the consent of the Lenders.

(e)     Execution in Counterparts.  This Amendment may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Amendment may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

IN WITNESS WHEREOF, Consultant and Merchant hereby execute this Amendment by their duly authorized representatives as of the day and year first written above.


GORDON BROTHERS RETAIL PARTNERS, LLC
As Consultant

By: _____
Name: michon church
Its: Praypr + Mana Direct


FINLAY FINE JEWELRY CORPORATION
As Merchant

By: _____
Name: Arthur E. Reiner
Its: Chairman & CEO

3

# Finlay Fine Jewelry Corporation
## Expense Budget
## Exhibit E-Revised with all 58 Stores

| | | |
|---|---|---|
| # of Stores | 58 | |
| Sale Term: | 03/21/09 | 10/25/09 |
| | Saturday | Saturday |
| # of days | 219 | |
| # of Weeks | 31.3 | |
| # of Store Weeks | 1,527.5 | |
| | | |
| Total Retail Inventory | 240,022,115 | |
| Total Cost Inventory | 108,832,692 | |
| IMU % | 54.7% | |
| CF % | 45.3% | |

**Operating Expenses:**

Payroll

| | |
|---|---|
| Payroll Stores | 8,009,133 |
| Commission | 2,000,216 |
| Incentive Bonus | 1,000,935 |
| Taxes & Benefits | 2,161,542 |
| **Subtotal Payroll** | **13,171,826** |

Advertising

| | |
|---|---|
| Media | 5,260,696 |
| Signs | 290,000 |
| **Subtotal Advertising** | **5,550,696** |

| | |
|---|---|
| All Occupancy as per Company Per Diem Schedules | 12,195,096 |
| **Occupancy** | **12,195,096** |

Miscellaneous

| | |
|---|---|
| Inventory Insurance | 114,270 |
| General Liability | 150,922 |
| Store Consolidation | 100,500 |
| Bank and Credit Card Fee's | 1,753,457 |
| Miscellaneous Expenses | 1,058,872 |
| Overhead | 209,730 |
| **Subtotal Miscellaneous** | **3,387,752** |

Supervision

| | |
|---|---|
| **Subtotal Supervision** | **2,834,751** |

| | |
|---|---|
| **Total Expenses** | **37,140,120** |

| | | |
|---|---|---|
| 12190 | Bailey Banks & Biddle<br>Valley Fair Shopping Center<br>2855 Stevens Creek Blvd., Ste. 1139<br>Santa Clara, CA 95050 | (408) 244-5354 |
| 12225 | Bailey Banks & Biddle<br>Coastland Center<br>1750 9th Street North<br>Naples, FL 34102 | (239) 649-1771 |
| 12323 | Bailey Banks & Biddle<br>2110 Park Plaza Mall<br>6000 W. Markham Street<br>Little Rock, AR 72205 | (501) 666-6802 |
| 12533 | Bailey Banks & Biddle<br>Northpark Center<br>907 Northpark Center<br>Dallas, TX 75225 | (214) 369-3221 |
| 12616 | Bailey Banks & Biddle<br>2132 Northeast Mall<br>1101 Melbourne Road, Ste. 4014<br>Hurst, TX 76053 | (817) 589-1371 |
| 098 | Carlyle & Co.<br>124 Four Seasons Town Center<br>Greensboro, NC 27407 | (336) 855-6225 |
| 305 | J.E. Caldwell & Co.<br>2193 Plaza at King of Prussia<br>160 North Gulph Rd.<br>King of Prussia, PA 19406 | (610) 265-5066 |
| 003 | Congress Jewelers<br>129 Duval Street<br>Key West, FL 33040 | (305) 296-5885 |

CONSENTED AND AGREED TO
BY: GENERAL ELECTRIC CAPITAL CORPORATION
As Credit Agreement Agent

By: _Charles Chiodo_
Name Charles Chiodo
Title Duly Authorized Signatory

Amendment #1 to Consulting Agreement
May 20, 2009